IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EMILY M. KRISTOFF, | CASE NO. 5:24-cv-683 |
| Plaintiff, | DISTRICT JUDGE |
| | DAVID A. RUIZ |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | JAMES E. GRIMES JR. |
| SECURITY, | |
| Defendant. | **REPORT &** |
| | **RECOMMENDATION** |

Plaintiff Emily Kristoff filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In May 2022, Kristoff filed an application for Disability Insurance Benefits alleging a disability onset date of October 5, 2021,[1] and claiming she was disabled due to depression, anxiety, hypermobility causing constant pain

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

in all joints, fibromyalgia, chronic fatigue, chronic constipation, migraines, high blood pressure, nerve damage in her right foot, and Morton's neuroma, a thickening of tissue surrounding the nerve at the base of one's toes. Tr. 200, 220. The Social Security Administration denied Kristoff's application and her motion for reconsideration. Tr. 85, 87. Kristoff then requested a hearing before an Administrative Law Judge (ALJ). Tr. 139.

In June 2023, an ALJ held a hearing. Kristoff and a vocational expert testified. Tr. 36–53. In July 2023, the ALJ issued a written decision finding that Kristoff was not disabled. Tr. 17–29. The ALJ's decision became final on April 5, 2024, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Kristoff filed this action on April 16, 2024. Doc. 1. She asserts the following assignment of error:

> Was the ALJ's RFC finding supported by the evidence and the rejection of the Plaintiff's treating source opinions legally sufficient?

Doc. 8, at 1.

**Evidence**

*Personal and vocational evidence*

Kristoff was born in 1988 and was 33 years old on her alleged disability onset date. Tr. 28. She last worked in December 2019 as a receptionist. Tr. 41.

*Relevant medical evidence*

In August 2019, Kristoff broke her fifth metatarsal bone in her right foot. Tr. 974. She had surgery to repair it, and in December 2019 she was "doing

great," "full weight[-]bearing without any problems," and had returned to work as a receptionist. Tr. 221, 974. She told the doctor that she would be changing jobs because the office where she worked would soon be closing. Tr. 974.

In November 2020, Kristoff visited chiropractor Roger Wilhelm, D.C., and complained of pain in her lower back, leg, neck, and upper back radiating to her left shoulder. Tr. 285. Dr. Wilhelm's exam findings showed that Kristoff walked with a limp and had limited range of motion in her spine. Tr. 285–86. She had positive straight-leg raise testing, weakness throughout her body, and mild tremors while resisting during muscle testing. Tr. 285–86. X-rays showed abnormalities in Kristoff's neck, thoracic spine, and lumbar spine. Tr. 288. Kristoff began chiropractic treatment. Tr. 287.

In December 2020, Kristoff saw her family doctor, Colin Drolshagen, M.D. Tr. 796. Dr. Drolshagen's treatment note indicated that Kristoff had a history of hypermobility and left shoulder instability. Tr. 796. She also had a history of chronic migraine headaches and foot pain. Tr. 796–97.

In February 2021. Kristoff was assessed for physical therapy for spine-related pain and chronic fatigue. Tr. 478. The treatment note listed Kristoff's "impairments" as activities of daily living, ambulation, balance, gait, weakness, and muscle performance. Tr. 478. Kristoff's exam finding showed that she had weakness in her arms and legs. Tr. 479. An x-ray of her left shoulder taken that month was unremarkable. Tr. 2118.

3

In July 2021, Kristoff underwent surgery on her right foot to remove an enlarged nerve near the base of her third and fourth toes. Tr. 759. At a follow-up visit in August, she reported decreased pain. Tr. 749. She also complained of a "sciatica type pain that starts in her right side low back and shoot[s] down to her toes." Tr. 749. She had decided not to go to therapy. Tr. 749. The doctor diagnosed Kristoff with lumbar radiculopathy and Mortan's neuroma and referred her for further testing to assess her right-leg radiculopathy. Tr. 751.

In September 2021, Kristoff saw a doctor in the otolaryngology department for laryngeal mobility. Tr. 745. Kristoff explained that she has hypermobility of her joints and that at times she felt her laryngotracheal complex "click[] out of position," which made swallowing difficult. *Id*.

In early October 2021, Kristoff visited the neurology department and underwent an EMG, which showed "moderately severe" right-sided sciatic mononeuropathy. Tr. 513, 1003. The neurologist diagnosed Kristoff with lumbar radiculopathy and a "lesion of [the] sciatic nerve" in her right leg. Tr. 513.

In mid-October, Kristoff saw Dr. Drolshagen for her migraines. Tr. 742. Kristoff reported that "if foot allows," she exercised daily on a bike for 30 to 60 minutes. Tr. 742. Dr. Drolshagen's exam findings showed that Kristoff had a normal range of motion in her cervical spine, hypermobile joints, and no focal neurological deficits. Tr. 744.

4

Later that month, Kristoff followed up with her foot surgeon. Tr. 739. The doctor commented that Kristoff "had been instructed to be weight bearing as tolerated" on her right leg. Tr. 739. Kristoff reported that she had been doing well since the surgery and that the neuroma-related pain in her foot had resolved. Tr. 739, 741.

In December 2021, Kristoff went to the emergency room for lower back pain and a fever. Tr. 384. She expressed concern that she had developed a urinary tract infection. Tr. 384. She was diagnosed with back pain and a urinary tract infection; prescribed antibiotics; and discharged home. Tr. 384.

In February 2022, Kristoff saw rheumatologist Amrita Padda, M.D., for an evaluation of pain. Tr. 335, 729.  Kristoff stated that every single joint hurt and that physical therapy did not help. Tr. 338. Dr. Padda's exam showed that Kristoff had a full or normal range of motion in her neck, shoulders, elbows, wrists, hands, hips, knees, feet, and ankles, with no swelling or tenderness. Tr. 733. She had no tenderness in her spine or sacroiliac joints. Tr. 733. She had hyperextensibility in her elbows, knees, thumb, and fifth fingers. Tr. 734. Dr. Padda diagnosed Kristoff with benign hypermobility syndrome and stated that she had all of the associated symptoms, including chronic pain, skin fragility, psychiatric dysfunction, gastrointestinal dysfunction, chronic fatigue, impaired balance, and reduced muscle function and mass. Tr. 335. She recommended that Kristoff participate in physical therapy; routine cardiovascular exercise, such as walking 30 minutes per day, to help reduce

5

widespread muscle pain; and Tai Chi or Pilates twice per week to practice balancing. Tr. 335.

In March 2022, Kristoff started physical therapy. Tr. 860. Kristoff reported moderate to severe chronic pain in both upper extremities and pain in her lower back, hips, knees, and ankles. Tr. 860. 862. Exam findings showed weakness in her arms, rated four out of five, and decreased grip strength. Tr. 860–61. She had weakness in her core and in her legs, rated "4+/5." Tr. 862–63. She exhibited an independent gait. Tr. 1222. In April, Kristoff started aquatic therapy. Tr. 341. She reported a decreased ability to perform activities of daily living due to pain and stability. Tr. 341. She displayed weakness and walked with decreased weight-bearing on her right foot due to nerve damage and her foot surgery. Tr. 342.

Meanwhile, Kristoff continued to receive treatment from Dr. Wilhelm, her chiropractor. Tr. 1026. In May 2022, she said that she was sore from pulling weeds in her garden. Tr. 1026. The same day, she followed up with the orthopedist who performed her foot surgery. Tr. 724. Kristoff reported nerve pain that radiated from her right hip down into her toes. Tr. 724. She said that she wore a larger-sized shoe on her right foot because a tighter shoe increased her pain. Tr. 724. Her primary care doctor had prescribed Neurontin, but it hadn't help. Tr. 724. An exam of Kristoff's foot and ankle showed intact sensation to light touch throughout and full muscle strength. Tr. 726. Palpation of Kristoff's knee caused pain in her leg and thigh. Tr. 726. Kristoff

6

walked with a normal gait, stood without assistance, and maintained balance. Tr. 726. She weighed 247 pounds. Tr. 725.

In June 2022, Kristoff established care with a pain management doctor. Tr. 2148–49. She reported constant pain in all joints, and, since her foot surgery in July 2021, pain in her right foot going up her leg. Tr. 2149. She also reported numbness and tingling in her right foot and weakness in her arms and legs.  Tr. 2149. Her medications included prescription strength Ibuprofen, Gabapentin, and Duloxetine. Tr. 2149. The doctor's exam findings showed that Kristoff had a normal gait and motor strength in her upper and lower extremities. Tr. 2154. She had intact sensation, except for in her right foot. Tr. 2154. She had a full range of motion in her shoulders and knees. Tr. 2154. She showed tenderness to palpation in her left shoulder and positive impingement signs in her right shoulder. Tr. 2154. The doctor adjusted Kristoff's medications and encouraged her to continue aqua therapy and home exercises. Tr. 2155.

In July 2022, Kristoff followed up with the pain management doctor. Tr. 1964. She reported that the increased dosage of Neurontin initially caused nausea, which had subsided somewhat, but neither it nor Meloxicam were helping much. Tr. 1964. The doctor adjusted Kristoff's medications and encouraged her to continue aqua therapy and routine home exercises. Tr. 1968.

In August 2022, Kristoff followed up with Dr. Padda for benign hypermobility. Tr. 1925. She reported having had a good experience with

7

physical and occupational therapy. Tr. 1926. Exam findings showed that Kristoff weighed 251 pounds. Tr. 1929. She had a full or normal range of motion in her neck, shoulders, elbows, wrists, hands, hips, knees, feet, and ankles, with no swelling or tenderness. Tr. 1929. She had no tenderness in her spine or sacroiliac joints. Tr. 1929. She had hyperextensibility in her elbows, knees, thumb, and fifth fingers. Tr. 1929. Dr. Padda assessed hypermobility and fibromyalgia and listed Kristoff's attendant fibromyalgia symptoms: migraines, fatigue, irritable bowel syndrome, anxiety, and depression. Tr. 1925. She encouraged Kristoff to continue her physical therapy exercises at home. Tr. 1925.

In September 2022, Kristoff' visited her orthopedic surgeon's office and stated that the symptoms in her right foot had worsened. Tr. 2045. Bearing weight on her foot exacerbated her pain. Tr. 2045. The doctor administered an injection in Kristoff's foot. Tr. 2049.

In October 2022, Kristoff followed up with pain management. Tr. 2113. She reported that her foot pain had improved with Lyrica, but she still had significant foot pain when standing or walking for long periods. Tr. 2113. Her widespread joint pain had not changed and she did not feel that medication was helping. Tr. 2113. She reported pain in all joints, numbness and tingling in her right foot, and weakness in her arms and legs. Tr. 2113. The doctor assessed fibromyalgia, generalized hypermobility of the joints, and injury to

the right sciatic nerve. Tr. 2118. He adjusted her medications and encouraged home exercises. Tr. 2118.

On December 13, 2022, chiropractor Roger Wilhelm completed a check-the-box questionnaire on Kristoff's behalf. Tr. 283–84. He found that Kristoff could frequently lift and carry ten pounds. Tr. 283. In an eight-hour workday, she could stand and walk for two hours total for up to five minutes at a time, and sit for two hours total for up to 15 minutes at a time. Tr. 283. She would need to lie down for one hour and take more than four unscheduled breaks. Tr. 284. Kristoff could only use her hands 50 percent of the time. Tr. 284. She could never climb, crouch, kneel, or crawl, and could occasionally balance and stoop. Tr. 283. She would be absent more than four days per month and would be off-task over 20 percent of the time. Tr. 284. Dr. Wilhelm based his opinion on decreased range of motion in Kristoff's spine, and "tingling, weakness[,] [and] tremors" in Kristoff's arms and legs. Tr. 283–84.

A few days later, Kristoff saw Dr. Drolshagen and complained of migraines, constipation, skin concerns, and facial pain. Tr. 2336. She had not been consistent with her exercise or swimming. Tr. 2336. She reported that the foot injection, Lyrica, and shoe inserts had helped her foot pain. Tr. 2337. Dr. Drolshagen commented that Kristoff's lumbar radiculopathy was improving with Lyrica "for pain and sleep." Tr. 2338.

The same day, Dr. Drolshagen completed a check-the-box questionnaire on Kristoff's behalf. Tr. 2208–09. He found that due to joint and foot pain,

Kristoff had difficulty lifting and carrying. Tr. 2208. She could occasionally lift and carry less than five pounds and could lift and carry no more than ten pounds. Tr. 2208. In an eight-hour workday, she could stand less than one hour and would need to stand or shift her weight while sitting "to avoid getting locked in." Tr. 2208. Kristoff would need to lie down for one hour and would need to take more than four unscheduled breaks throughout the workday. Tr. 2209. She could only use her hands 40 percent of the workday. Tr. 2209. She could never climb, balance, stoop, crouch, kneel, or crawl. Tr. 2208. She would be absent more than four days per month, and would be off-task over 20 percent of the time. Tr. 2209. Dr. Drolshagen based this opinion on Kristoff's joint hypermobility and chronic foot pain, and explained that he filled out the form "with discussion with the patient." Tr. 2209.

In early February 2023, Kristoff received a Botox injection for chronic migraines. Tr. 2447.

Later that month, Kristoff visited pain management and said that her widespread pain was "relatively the same." Tr. 2287. Kristoff saw Dr. Padda and reported "immense stress." Tr. 2428. Dr. Padda reiterated that Kristoff had hypermobility and fibromyalgia and associated symptoms. Tr. 2428. She advised that stress "can definitely amplify fibromyalgia symptoms" and encouraged Kristoff to perform routine cardiovascular exercise, such as walking 10 to 30 minutes a day, to help reduce widespread pain. Tr. 2428. Dr. Padda provided Kristoff with an aqua therapy referral. Tr. 2428.

10

In March 2023, Kristoff began physical therapy again for fibromyalgia and hypermobility syndrome. Tr. 2266. She reported foot pain with prolonged weight-bearing activity and complained of difficulty performing daily activities. Tr. 2266. The therapist's exam findings showed that Kristoff had weakness in her legs, rated "-4/5," and an antalgic gait.[2] Tr. 2266.

In mid-April 2023, Kristoff visited a new pain management doctor who Dr. Drolshagen had referred her to. Tr. 2214. Kristoff reported diffuse pain that worsened with prolonged standing or sitting. Tr. 2214. That day, she weighed 285 pounds. Tr. 2214. She walked with a normal gait. Tr. 2215. She had a normal range of motion in her cervical spine and no tenderness. Tr. 2215. Kristoff had tenderness to palpation in her lumbar spine and a normal lumbar range of motion. Tr. 2215. Her cervical and lumber spines were "stable" and her straight leg raise testing was negative. Tr. 2215. Kristoff had reduced range of motion in her right ankle and tenderness in her right foot. Tr. 2215. She had normal reflexes, coordination, and muscle strength. Tr. 2215. She had pain in 11 out of 18 tender points, meeting the criteria for fibromyalgia. Tr. 2215–16. The doctor diagnosed Kristoff with fibromyalgia and right ankle pain and encouraged her to "stay active." Tr. 2216.

In late April, Kristoff had another Botox injection for her migraine headaches. Tr. 2438. The neurologist performed an exam and found that

---

[2]    An antalgic gait is an abnormal gait due to the person trying to avoid pain. *See* Dorland's Illustrated Medical Dictionary, at 96 (33rd ed. 2020).

Kristoff had intact sensation in her arms and legs, intact coordination, and a normal gait and station. Tr. 2443. Her muscle strength was "4+" out of 5. Tr. 2443.

In early May, Kristoff followed up with Dr. Drolshagen for her hypertension. Tr. 2306. She also reported chronic migraine headaches, lower back pain, and occasional numbness down her right leg. Tr. 2306. The treatment note mentioned imaging of Kristoff's spine, which showed small dorsal vertebral spurs and was otherwise unremarkable. Tr. 2311.

In June 2023, Kristoff saw Dr. Wilhelm, the chiropractor, and reported severe lower back pain and pain in her neck and upper back. Tr. 2468. Dr. Wilhelm stated that his exam of Kristoff's spine showed decreased joint mobility and spinal misalignment. Tr. 2468.

*State agency opinions*[3]

In July and October 2022, Gerald Klyop and W. Scott Bolz, M.D., respectively, reviewed Kristoff's record and assessed Kristoff's residual

---

[3]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

functional capacity (RFC).[4] Tr. 82, 91. They opined that Kristoff could perform light work with the following limitations: frequently push and pull with her arms and legs, frequently reach overhead with her arms, and frequently handle and finger. Tr. 82, 91–92. She could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Tr. 82, 92. She could never climb ladders, ropes, or scaffolds, and had some environment limitations. Tr. 82, 92.

*Hearing testimony*

Kristoff, who was represented by counsel, testified at the telephonic administrative hearing held in June 2023. Kristoff confirmed that she has a driver's license with no medical restrictions. Tr. 41. When asked what prevented her from working full time, Kristoff responded that her lower back gave her the most problems. Tr. 43–44. She couldn't bend, and she couldn't sit, stand, or walk for extended periods of time. Tr. 44. Lying down sometimes hurt. Tr. 44. Her hands gave her "major issues" that had been getting worse; it hurt to hold objects in her hands. Tr. 44. Sometimes ascending stairs was not possible because of her knees. Tr. 44. Kristoff estimated that she could walk for five minutes and lift or carry five pounds or less. Tr. 44.

---

[4]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

When asked to describe a typical day, Kristoff answered that the question was difficult to answer because she doesn't have a typical day. Tr. 45. It depends on how her body felt—for example, the day before the hearing she couldn't get out of bed until 2:00 in the afternoon due to a bad migraine. Tr. 45. Kristoff attends weekly doctors' appointments and watches television. Tr. 45. She used to enjoy making crafts, but she could no longer do so because of her hand problems. Tr. 46. She showered no more than once a week and wore clothes without buttons or snaps to accommodate issues with her fingers. Tr. 46. Kristoff said that she couldn't do basic household chores "for the most part" and that preparing food was "not an option most of the time." Tr. 46. When asked if she could perform a job that required her to "use [her] hands over and over again … probably the majority of the day," Kristoff said that she could not perform such a job. Tr. 47.

Kristoff agreed with counsel that her back and leg pain had worsened over time. Tr. 47. When asked what her most comfortable position was, Kristoff said that she has to elevate her feet and use an icepack or heating pad on her back, and that she either sits in her recliner or lies in bed. Tr. 47. She estimated that she did this for about 70 percent of the day. Tr. 47–48.

The ALJ discussed with the vocational expert Kristoff's past relevant work as receptionist, sales clerk, and cashier. Tr. 42–43, 49. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Kristoff could perform Kristoff's

14

past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 49–51. The vocational expert answered that such an individual could not perform Kristoff's past work but could perform the following jobs in the national economy: order clerk, phone quotation clerk, and charge account clerk. Tr. 63–64. When asked if the individual could perform work if she was limited to occasional handling and fingering, the vocational expert said no. Tr. 51. And when asked whether an individual could perform work if she would be off-task more than 15 percent of the time and absent more than two days per month, the vocational expert stated that there would be no jobs for such an individual. Tr. 50.

### The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant meets the insured status requirements of the Social Security Act (the "Act") through December 31, 2024. This finding adheres to that of the previous decision.

> 2.  The claimant has not engaged in substantial gainful activity since October 5, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*). Except that this finding recites the alleged onset date for the current claim, it adheres to that of the previous decision.

> 3.  The claimant has the following severe impairments: obesity, hypermobility joint syndrome at multiple sites, and major depressive disorder with moderate anxious distress (20 CFR 404.1520(c)). This finding adheres to that of the previous decision.

> 4.  The claimant does not have an impairment or combination of impairments that meets or medically

15

equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). This finding adheres to that of the previous decision.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant may frequently push and/or pull with the bilateral upper and lower extremities; the claimant may frequently reach overhead with the bilateral upper extremities and may frequently handle and finger with the bilateral upper extremities; the claimant may frequently balance, stoop, kneel, crouch, crawl, may occasionally climb ramps and stairs but may never climb ladders, ropes, or scaffolds; the claimant may occasionally be exposed to dust, fumes, odors and pulmonary irritants but must avoid all exposure to unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine tasks and to the making of no more than simple, work-related decisions. This finding departs from that of the previous decision, in order to accommodate the present state of the impairments as documented in the current evidence.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565). This finding adheres to that of the previous decision.

7.   The claimant was born [i]n … 1988 and was 33 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563). This finding departs from that of the previous decision, in order to reflect the claimant's attainment of greater chronological age.

8.   The claimant has at least a high school education (20 CFR 404.1564). This finding adheres to that of the previous decision.

16

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2). This finding adheres to that of the previous decision.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a). This finding adheres to that of the previous decision.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from October 5, 2021, through the date of this decision (20 CFR 404.1520(g)). Except that this finding recites the alleged onset date for the current claim, it adheres to that of the previous decision.

Tr. 19–29.

## Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

17

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

### Discussion

Kristoff argues that the ALJ's RFC is not supported by substantial evidence and that the ALJ's evaluation of the treating providers' opinions is "legally insufficient." Doc. 8, at 18.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. *Id*. at § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. *Id*. at § 416.920c(b)(2). "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[ ] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). "Consistency" means "[t]he more consistent a medical opinion[ ] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[ ] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations

20

to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ's evaluation of the opinions of Dr. Drolshagen, Kristoff's primary care provider, and Dr. Wilhelm, Kristoff's chiropractor, were similar.[5] Tr. 26–27. Given that Kristoff combines her arguments challenging these two providers' opinions, so do I.

The ALJ noted that Dr. Drolshagen was Kristoff's primary care physician and that Dr. Wilhelm was Kristoff's chiropractor. Tr. 26, 27; *see* 20 C.F.R. § 416.920c(c)(4) (requiring the ALJ to consider the provider's specialty). The ALJ recognized that Dr. Wilhelm had treated Kristoff "since before the alleged onset date for this claim." Tr. 27; *see* 20 C.F.R. § 416.920c(c)(3) (requiring the ALJ to consider the length of treatment relationship). The ALJ summarized the providers' opinions, including that Kristoff would be absent more than four times per month, would be off-task more than 20 percent of the workday, would need to lie down for one hour in an eight-hour workday, and would need more than four unscheduled breaks a day. Tr. 26, 27. The ALJ stated that Drs. Drolshagen's and Wilhelm's treatment records showed that Kristoff "generally presents as and when appointed and is able to participate

---

[5]     Kristoff states that "[o]ddly, the reasoning for [the ALJ] rejecting both opinions is almost exactly word for word." Doc. 8, at 19 (citing Tr. 26–27). But she doesn't argue that this similarity is evidence of error. Moreover, both providers completed the same form, and their opinions were similar. Tr. 283–84, 2208–09.

in treatment and planning without breaks or reminders," so "[t]here is no objective basis for [their] opinion of absenteeism, off-task behaviors, the need for additional breaks or periods of lying down." Tr. 26, 27.

Kristoff asserts that this statement is "simply false," Doc. 8, at 20, but doesn't cite a specific portion of the record to support her assertion.[6] She submits that, "as discussed earlier and below, there is a plethora of consistent objective evidence to support their opinions." *Id.* Kristoff references her earlier summary of four years' of treatment notes and reiterates some of those records.[7] *Id.* The only specific argument she makes is to point out that at the hearing, she testified that she was most comfortable sitting in her recliner or lying on her bed, and she estimated that she spent about 70 percent of the day in these positions. *Id.* at 23 (citing Tr. 47–48). But the ALJ explained that Kristoff's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the record, Tr. 25, a finding that Kristoff doesn't challenge.[8] Kristoff hasn't explained how the ALJ's finding—that Drs.

---

[6]     Kristoff cites two pages from the ALJ's decision, but doesn't explain how these two pages show that the ALJ's explanation was "false." Doc. 8, at 20 (citing Tr. 26–27).

[7]     Kristoff cites records beginning in November 2020, which pre-date her alleged disability onset date of October 5, 2021. Doc. 8, at 21. An ALJ considered this evidence in October 2021 when rejecting Kristoff's 2020 disability application. *See, e.g.*, Tr. 64.

[8]     In her reply brief, Kristoff asserts that the ALJ's treatment of her statements was "contrary at best." Doc. 11, at 6–7. If this is an attempt to challenge the ALJ's evaluation of Kristoff's statements, it is improper because "[a]n argument first presented to the Court in a reply brief is" forfeited. *United*

Drolshagen's and Wilhelm's opinion about Kristoff's absenteeism and off-task behaviors were unsupported by objective evidence in their own treatment notes—is "simply false." *See* Doc. 8, at 21–23.

Kristoff complains that the ALJ's statement that Kristoff generally presented for her appointments and was able to participate in treatment and planning without breaks and reminders "penalizes" Kristoff "for attending and participating in her scheduled appointments which is actually required by the regulations." Doc. 8, at 20 (citing Soc. Sec. Ruling 16-3p and "HALLEX II 4-1-2"); Doc. 11, at 5.[9] But Kristoff misses the narrow point that the ALJ was making—that the providers' opinions regarding off-task time and absenteeism were unsupported by objective evidence in their own treatment notes. Tr. 26, 27. Kristoff does not show that this finding is "false," as she alleges, Doc. 8, at 20. Moreover, the ALJ's reasoning goes directly to the heart of the supportability factor. *See* 20 C.F.R. § 416.920c(c)(1) (Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[ ] … the more persuasive the medical opinions … will be.").

---

*States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). If it is an attempt to challenge the ALJ's finding that the doctors' treatment notes "had no objective basis for [their] opinion," Tr. 26, it would fail because Kristoff's statements are not objective evidence.

[9]     Kristoff doesn't provide a pin cite or a parenthetical to explain what about these two citations, which each span numerous pages, applies to her argument.

Next, Kristoff argues that the ALJ's reasoning was "legally insufficient as there is no detailed and evidence[-]based explanation" and "no real discussion from the ALJ about supportability and consistency of the opinions other than to say they were marginally consistent and supported." Doc. 8, at 23; Doc. 11, at 2, 5. But the ALJ discussed the supportability factor, as explained above. As for the consistency factor, the ALJ expressly incorporated by reference his recitation of the record in his discussion of the state agency reviewers' opinions. When evaluating Dr. Drolshagen's opinion, the ALJ wrote:

> [A]lthough the record, described in digest form in the preceding paragraph does support the existence of exertional, postural, manipulative and environmental limitations, the limitations suggested by Dr. Drolshagen are overstated by comparison to that same record. This opinion is only marginally consistent with, and supported by, the overall evidence of record and is not persuasive.

Tr. 26. And:

> [A]lthough the record, described in digest form in the analysis of the opinions of consultant Klyop and Dr. Bolz, above, does support the existence of exertional, postural, manipulative and environmental limitations, the limitations suggested by Dr. Wilhelm are overstated by comparison to that same record. This opinion is only marginally consistent with, and supported by, the overall evidence of record and is not persuasive.

Tr. 27. When evaluating the state agency reviewers' opinions, referenced by the ALJ in the passages above, the ALJ explained:

> The record shows an obese claimant with joint hypermobility syndrome, but of the benign variety (B5F/14) and without radiographic evidence of

24

chronic dislocations, fractures, or erosions (B27F/8, 6), (B18F/8). Clinical examinations have not described widespread joint tenderness or swelling (B7F/16-17), (B14F/6), but have generally described preserved strength and neurological function (B18F/44-45), (B22F/2), including gait (B7F/9), (B22F/2), and coordination (B22F/2), (B30F/6). The claimant has retained an array of activities of daily living of sufficient breadth to encompass typical indoor chores, pet care, driving and shopping (B2A/3), with some outdoor chores, such as maintenance of a flower garden (B8F/38). Restriction to sedentary work is warranted for the claimant's reports of pain. Limitations on pushing and pulling, are also warranted for the claimant's pain, and the known hyperextensibility of elbow, knee, thumb, wrist, finger and waist (B7F/16-17). Mild postural limitations, in recognition of the foregoing, are warranted as all such maneuvers would bring the shoulders, elbows, hands, knees and waist into play. Mild manipulative limitations are warranted for the claimant's reports of difficulties with handling and fingering, and isolated reference to positive Hawkin's and Neer's signs in the shoulders (B18F/44-45). Mild limitations on pulmonary restrictions are warranted owing to the claimant's reported difficulties with changes in weather (B3E/1). Precautionary against a sudden "burst" of pain from whatever source, or the need to recover a misstep faster than her body habitus would allow, the claimant should not be asked to work at unprotected height, in the vicinity of inherently dangerous machinery, or to use unguarded climbing apparatuses.

Tr. 25–26. The ALJ's incorporation of this summary of the record serves to explain why he found that the limitations in Drs. Drolshagen's and Wilhelm's opinions were inconsistent with other evidence in the record. *See* 20 C.F.R. § 416.920c(c)(2) ("Consistency" means "[t]he more consistent a medical opinion[]

25

… is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[ ] … will be.").

Kristoff ignores the ALJ's clear incorporation of this record evidence into his explanation for rejecting Drs. Drolshagen's and Wilhelm's opinions. As a result, she hasn't challenged the ALJ's reasoning, detailed above, or shown how it fails to support the ALJ's finding that Drs. Drolshagen's and Wilhelm's opinions were inconsistent with other evidence in the record. Reciting evidence that Kristoff believes supports her argument, Doc. 8 at 21–22, doesn't show that the ALJ's RFC is unsupported by substantial evidence because "so long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports Kristoff's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

Kristoff contends that the ALJ "stated that the fact Ms. Kristoff was urged to increase exercise and activity including cardiovascular exercise, Pilates, and Tai Chi showed her physical limitations were not as bad as alleged." Doc. 8. at 22–23 (citing Tr. 23). She juxtaposes this with her complaints to her doctors of pain. *Id*. But she doesn't describe an error or explain the significance of her assertions. And Kristoff's characterization of the ALJ's statements does not provide a complete picture. The ALJ found that Kristoff "has repeatedly been urged to increase activity and exercise" to strengthen the muscles around her joints; physical therapy records show that "after only eight visits," occupational therapy helped her hands and aquatic

26

therapy helped her "form and endurance"; and yet Kristoff failed to consistently exercise. Tr. 23. The ALJ explained, therefore, that Kristoff's statements about the severity of her symptoms and limitations were inconsistent with the record. Tr. 25. Kristoff doesn't argue that the ALJ's characterization lacks evidentiary support or that his reasoning was faulty. She string-cites 25 transcript pages and claims, "[t]hat is over 25 physical therapy visits that objectively indicated problems with bilateral upper and lower extremity weakness, gait abnormality, and weight bearing issues." Doc. 8, at 21. But the ALJ commented on Kristoff's therapy, cited above, and the ALJ acknowledged and accounted for Kristoff's problems by limiting her to sedentary work and restricting her in reaching, pushing and pulling with her arms and legs, postural and manipulative maneuvers, and environmental exposure. Tr. 22, 25–26.

Finally, Kristoff mentions the ALJ's evaluation of the state agency reviewers' opinions. Doc. 8, at 24 (citing Tr. 25–26). Although she appears to question the ALJ's evaluation, she doesn't allege an error. *See id*. To the extent that it could be said that she is arguing that it was error for the ALJ to assess a more restrictive RFC than the state agency reviewers had assessed, such an argument would fail. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio Jun. 16, 2022) ("The Court will not fault the ALJ for finding more restrictions than the state agency reviewers opined") (citing *Mosed v. Comm'r of Soc. Sec.*, No. 2:14-cv-14357, 2016 WL 6211288, at *7 (E.D.

27

Mich. Jan. 22, 2016) ("Plaintiff's argument that the ALJ erred in assessing a *more restrictive* RFC than that opined by the State agency consultants is curious and unavailing") (citation omitted), *report and recommendation adopted*, 2016 WL 1084679 (E.D. Mich. Mar. 21, 2016)).

In sum, Kristoff hasn't shown that the ALJ's RFC lacks substantial evidentiary support or that the ALJ failed to adhere to the regulations when evaluating Drs. Drolshagen and Wilhelm's opinions. So the ALJ's decision should be affirmed. *See Jordan*, 548 F.3d at 422.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: August 29, 2024

 */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).